1  Christopher R. Dryden, Esq. (SBN 234476)
   cdryden@attorneygl.com
2  Bryce M. Van De Moere, Esq. (SBN 201752)
   bvandemoere@attorneygl.com
3  Michael D. Douglas, Esq. (SBN 265210)
   mdouglas@attorneygl.com
4  GLOBAL LEGAL LAW FIRM
   322 Encinitas Blvd., Suite 200
5  Encinitas, CA 92024
   Telephone:  (888) 846-8901
6  Facsimile:  (888) 846-8902

7  Attorneys for Plaintiff
   AppTech Payments Corp.
8

9              UNITED STATES DISTRICT COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11

12 APPTECH PAYMENTS CORP., a         Case No. 3:22-cv-1889-TWR-WVG
   Wyoming Corporation,
13                                   *Judge: Hon. Todd W. Robinson*
          Plaintiff,                 *Magistrate Judge William V. Gallo*
14
       vs.                           **PLAINTIFF'S FIRST AMENDED
15                                   COMPLAINT FOR:**
   NCR PAYMENT SOLUTIONS, LLC, a
16 Texas Corporation, and DOES 1 through   1. Declaratory Relief
   10,                                     2. Breach of Contract
17                                         3. Breach of the Implied Covenant of
          Defendants.                         Good Faith and Fair Dealing
18                                         4. Specific Performance
                                           5. Accounting
19

20

21                                   Complaint Filed:  November 30, 2022

22      Plaintiff APPTECH PAYMENTS CORP. ("AppTech" or "Plaintiff") files this

23 Complaint against Defendant NCR PAYMENT SOLUTIONS, LLC ("NCR" or

24 "Defendant"), and DOES 1-10, and alleges as follows:

25            **THE PARTIES, JURISDICTION AND VENUE**

26      1.    At all times relevant to this action, Plaintiff was organized under the laws

27 of the State of Wyoming, with its principal place of business in Carlsbad, California.

28      2.    At all times relevant to this action, Defendant was a limited liability

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-8901

company organized and existing under the laws of the State of Texas, with its principal place of business in Atlanta, Georgia.

3. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that there is diversity of citizenship among the parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest, cost, and attorney's fees.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) given Defendants regularly conduct business in the State of California and a substantial part of the events giving rise to the allegations in this Complaint occurred in the State of California.

5. The true names and capacities, whether individual, plural, corporate, partnership, associate or otherwise of DOES 1 through 10, inclusive, are unknown to AppTech who therefore sues said defendants by such fictitious names. The full extent of the facts linking such fictitiously sued defendants is unknown to AppTech. AppTech is informed and believes, and based thereon alleges, that each of the defendants designated herein as a DOE was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally and proximately caused the hereinafter described injuries and damages to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the DOE defendants' true names and capacities after the same have been ascertained.

6. AppTech is informed and believes, and based thereon alleges that Defendants, including DOES 1 through 10, inclusive, were agents, servants employees, successors in interest, and/or joint venturers of their co-defendants, and were as such acting within the course, scope, and authority of said agency, employment and/or venture, and that each and every defendant, as aforesaid, when acting as a principal, was negligent in the selection of each and every other defendant as an agent, servant, employee, successor in interest, and/or joint venturer. AppTech is informed and believes, and based thereon alleges, that each of the defendants designated herein

2

1  as DOE aided and abetted, conspired with and/or took part in and participated with
2  each other Defendant in all matters referred to herein, and was in some manner
3  responsible for the inquiries and losses suffered by AppTech.

## FACTUAL ALLEGATIONS

5  7.  On or around March 24, 2009, AppTech (through its predecessor in name
6  only TranscendentOne, Inc.) contracted with NCR's predecessor, JetPay ISO Services,
7  LLC ("JISO") to act as a "sales agent" for JISO, soliciting merchants that wanted the
8  ability to accept credit cards and debit cards ("Cards") for payment of those merchant's
9  goods and services (the "AppTech/JISO Agreement.") A true and correct copy of the
10 AppTech/JISO Agreement is attached hereto as **Exhibit 1**.

11 8.  JISO worked as an "Independent Sales Organization" or "ISO" who, in
12 partnership with a sponsoring bank, provided small business owners commonly
13 referred to as "merchants" the ability to accept Cards and to "authorize" and "settle"
14 those Card payments.

15 9.  Plaintiff as a sales agent for JISO (and subsequently NCR), would solicit
16 merchants to apply for JISO's payment processing services (the "JISO Services.").

17 10. Any merchant referred by AppTech to JISO whose application for the JISO
18 Services was accepted by JISO would then enter a Merchant Processing Agreement with
19 JISO and its sponsor bank which would give that merchant the ability to process its Card
20 transactions using the JISO Services (each a "Referred Merchant").

21 11. In exchange for now having the ability to process those Card transactions the
22 merchant paid JISO a monthly fee. That fee was based on the number of card transactions
23 and gross volume in dollars of payments processed by a merchant in any given month.

24 12. AppTech, as the party that referred the merchant (the "Referred
25 Merchant") to JISO was entitled to compensation for that successful referral.

26 13. Under the AppTech/JISO Agreement, AppTech agreed that in addition to
27 soliciting merchants to enter into merchant agreements with JISO and its acquirer, it
28 would also (among other things) assist the merchant applicant in the completion of the

3

merchant application, and confirm that the merchant was a bona fide business, all with the goal of presenting a merchant to JISO who would be deemed acceptable for the purveyance of payment processing services by JISO and the acquiring bank.

14. As defined by the AppTech/JISO Agreement, AppTech was entitled to and did receive a percentage of the fees collected from the Referred Merchant by JISO and defined above. The percentage of the fee collected by JISO from the Referred Merchant for use of the JISO Services was paid to AppTech in the form of a monthly commission called a "residual."

15. If an AppTech Referred Merchant continued to utilize the JISO Services, AppTech was entitled to receive a monthly residual for that Referred Merchant's use of the JISO Services. As long as JISO was able to collect the fee associated with an AppTech Referred Merchant's processing, AppTech would get paid a residual for that Referred Merchant.

16. "Schedule A" to the AppTech/JISO Agreement titled "Agent Residual Split" stated that JISO, upon receipt of compensation for the Referred Merchant, would calculate the margin for each account and that (AppTech's) percentage split of the amount received by JISO from the Bank would be 60%/40%, with 60% going to AppTech.

17. The AppTech/JISO Agreement also warranted that "[i]n conjunction with each monthly fee payment, if any, from JISO to [AppTech] …JISO shall provide to [AppTech] a report setting forth the basis upon which the fee payment is computed."

18. The AppTech/JISO Agreement also stated that JISO would have the right to amend the provisions of Schedule A, B, and C by giving AppTech 30 days written notice of the change.

19. However, the AppTech/JISO Agreement further stated that the Agreement could be modified only by a writing which had been signed by both parties, except for any provision that "is deemed to be in violation of any rule or regulation" of the Card Brands.

20. In 2018, JISO was acquired by NCR, also an ISO, and, based on information and belief, NCR assumed all contractual obligations owed to AppTech

under the AppTech/JSIO Agreement, including payment of residuals to AppTech.

21. In 2019, AppTech's auditors discovered that AppTech was being underpaid on the residuals it was owed by NCR. While NCR had been put on notice of the underpayment by Appptech, and there were meetings and conversations concerning the underpayment, no action was taken by NCR to rectify the situation.

22. Approximately two years after assuming the duties proscribed under the AppTech/JISO Agreement, NCR required AppTech to sign a new Agreement with NCR. This new Retail Independent Sales Organization Agreement was entered into by NCR and AppTech on or around April 24, 2020 (the "AppTech/NCR Agreement.") A true and correct copy of the AppTech/NCR Agreement is attached hereto as **Exhibit 2**.

23. The AppTech/NCR Agreement contained numerous provisions which altered the terms of the AppTech/JISO Agreement. No longer would written residual reports be provided to AppTech, instead NCR would post the residual reports to a web portal (the "NCR Portal") to which it would provide AppTech access. The onus would now be on AppTech to access the NCR Portal and view and download the residual reports.

24. In addition, the AppTech/NCR Agreement superseded the AppTech/JISO Agreement and rendered the AppTech/JISO Agreement terminated.

25. Specifically, Section 18 of the AppTech/NCR Agreement provided "This Agreement, including the attached Schedule A, which is hereby incorporated by reference, sets forth the entire understanding of the parties relating to this subject matter and supersedes any other agreement between the parties, whether written or oral, relating to its subject matter. The parties expressly agree that this Agreement supersedes and replaces that certain JetPay ISO Service LLC Independent Contractor Agreement between JetPay ISO Services LLC and TranscendentOne, Inc. on March 24, 2009 which is hereby terminated."

26. Schedule A to the AppTech/NCR Agreement reflected the calculation of residual payments to AppTech for Referred Merchants. Schedule A, in pertinent part, provided AppTech would receive 87% for "Standard Merchants," 60% for "High-Risk

Merchants" and "The High-Risk Merchant known as AMERICAN RESIDENTIAL WARRANTY SERVICES – 402529225000011 will continue to be paid at a 50% Residual rate."

27. American Residential Warranty ("ARW") (referenced in Schedule A above) was a long-time AppTech client that Apptech had "onboarded" with JISO for the JISO Services. Apptech's relationship with ARW predated ARW's onboarding with JISO.

28. JISO previously purported to identify ARW as a high-risk merchant pursuant to a December 1, 2009 letter to AppTech. A true and correct copy of this letter is attached hereto as **Exhibit 3**.

29. On or around August 11, 2021, AppTech contacted NCR about lowering ARW's pricing under its merchant agreement for the JISO (now NCR) Services. NCR responded that it was disinclined to lower the fees as ARW was already processing payments at a "slim margin" to NCR, which AppTech interpreted to mean the NCR was receiving as low a fee for the use of its services as it could tolerate.

30. AppTech was confused by NCR's response because it believed this to be inconsistent with the pricing set forth in the ARW's merchant agreement with JISO. Nonetheless, NCR's representative stated it would forward AppTech's request to the appropriate parties at NCR.

31. On or about August 27, 2021, NCR responded to AppTech's request, first declining to reduce the fees being charged to ARW for use of the NCR Services but in addition notifying AppTech that NCR had determined that following an internal investigation, NCR had been overpaying AppTech and that AppTech needed to reimburse NCR for $85,260.90 in overpaid residuals.

32. AppTech asked NCR for an accounting from NCR which would explain why NCR believed it had been overpaying AppTech. However, NCR refused to provide any documentation substantiating the claim that it was overpaying AppTech, nor would it explain how it had discovered such alleged overpayment.

33. Thereafter, NCR continued to assert, without providing any documentation to

AppTech, that it had been overpaying AppTech.

34. Although not accepting NCR's contentions regarding overpayment, AppTech stated that it would be willing to waive the underpayment in residual that it had brought to NCR's attention in 2019 if NCR would waive the amount of the alleged overpayment. The two amounts, the underpayment alleged by AppTech and the overpayment alleged by NCR would be considered a "wash", each side foregoing the amount they believed they were entitled to in the spirit of preserving the relationship.

35. NCR responded to AppTech by providing a letter allegedly from JISO to AppTech, dated December 1, 2009 (*see* **Exhibit 3**), that stated effective January 1, 2010, the percentage at which residuals were paid for high-risk merchants (like ARW) would be lowered by 10%. NCR without foundation asserted that AppTech had been provided notice of the residual change by that Letter.

36. AppTech responded that it had never received the Letter. The Letter was not addressed to any specific person at AppTech, nor could NCR, despite AppTech's request, provide any documentation to prove that the Letter had been sent, received or acknowledged by either JISO or AppTech.

37. NCR took the position that it could not provide any further information related to the Letter, nor could it provide AppTech any financial information confirming whether AppTech had been receiving the appropriate residuals from NCR, or for that matter from JISO before it. NCR further stated that any information responsive to AppTech's request was stored on a "legacy server" and thus not available.

38. NCR continued to assert its baseless position, demanding that AppTech reimburse NCR for the alleged overpayment it could not document or explain, ignoring AppTech's repeated request that NCR do just that, prove it was owed money by Apprech and had not underpaid AppTech.

39. Further, NCR refused to apply a credit for any amount related to the underpayment that it had acknowledged by email that AppTech had brought to NCR's attention in 2019. NCR refused to yield on the assertion that it was owed $85,260.90.

7

PLAINTIFF'S FIRST AMENDED COMPLAINT

40. AppTech and NCR continued to have discussions regarding the alleged overpayment, but in or around February 3, 2022, NCR abruptly terminated any further discussions, deemed AppTech's refusal to reimburse NCR an "Event of Default" and based on that justification terminated the AppTech/NCR Agreement.

41. NCR has relied on this purported "Event of Default" to assert it is no longer obligated to pay residuals to AppTech.

42. NCR contends it now maintains exclusive ownership of the Referred Merchants (including ARW) and no longer were required to pay AppTech the residuals it would have been owed but for the termination.

43. To add insult to injury, AppTech also lost ARW as a client, and thus a business relationship what predated both NCR and JISO was severed.

44. NCR's termination is not supported by the terms of the AppTech/NCR Agreement, specifically Sections 14 and 15, which address Termination and Events of Default.

45. AppTech did not default on any obligation under the AppTech/NCR Agreement. Rather, NCR exercised a peremptory termination of the agreement on unfounded grounds to avoid its obligations to make up the shortfall in residual amounts due to AppTech.

46. NCR even went so far as to manufacture an alleged overpayment to AppTech, for which it has refused to provide an accounting, in order to obtain leverage over AppTech to excuse the obligation to pay it the amounts it is owed.

47. While AppTech has at all times operated pursuant to the terms of the AppTech/NCR Agreement, including the obligation to attempt to resolve disputes informally, and fulfill its implied obligation of good faith and fair dealing, NCR has acted in bad faith as evidenced by the conduct described herein, including its wrongful termination of the AppTech/NCR Agreement and its refusal to pay AppTech the amounts it is owed.

///

///

## FIRST CAUSE OF ACTION

### (Declaratory Relief)

### (Against NCR and Does 1 through 10)

48. Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth in support of this cause of action.

49. As set forth in detail above, a dispute has arisen between the parties regarding the amounts payable to AppTech under the AppTech/NCR Agreement.

50. NCR contends AppTech has been overpaid and AppTech contends it has been underpaid.

51. Additionally, AppTech and NCR dispute whether termination of the AppTech/NCR Agreement was justified.

52. AppTech has a right to receive the benefit of the bargain under the AppTech/NCR Agreement. NCR apparently contests that right based on its termination and refusal to pay AppTech what it is owed under the AppTech/NCR Agreement.

53. There is a genuine controversy among the parties based on the foregoing disputes and there is no alternative to resolution aside from judicial intervention at this time.

54. The dispute between the parties is ripe for judicial determination.

55. Based on the foregoing, AppTech seeks a judicial declaration establishing the parties' rights and duties pursuant to the AppTech/NCR Agreement, namely (1) what amounts are owed to AppTech by NCR, or vice versa based on NCR's contentions that it is owed money under the agreement, and (2) whether NCR's purported termination of the AppTech/NCR Agreement was valid.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

### (Against NCR and Does 1 through 10)

56. Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth in support of this cause of action.

57. On or about March 24, 2009, AppTech and JISO entered the AppTech/JISO Agreement attached as Exhibit 1. On or about October 22, 2018, JISO was acquired by NCR, and NCR assumed contractual obligations of JISO under the AppTech/JISO Agreement. On April 24, 2020, NCR and AppTech entered the AppTech/NCR Agreement attached as Exhibit 2.

58. AppTech has performed all terms, conditions, covenants, and promises required of it under the AppTech/NCR Agreement, except those that have been discharged, excused, waived or prevented.

59. NCR has materially breached the AppTech/NCR Agreement by:

    a. Unilaterally changing the compensation to be paid to AppTech without providing proper notice of the change;

    b. Stating that NCR has overpaid AppTech residual compensation derived from ARW without providing adequate documentation to support its assertion of overpayment;

    c. Failing to take action when notified of its underpayment of residual compensation owed to AppTech;

    d. Failing to participate in good faith in efforts to resolve the parties' dispute; and

    e. Unjustifiably terminating the AppTech/NCR Agreement and ceasing to pay AppTech the amounts owed for the merchants onboarded by AppTech.

60. As a direct and proximate result of NCR's breach of the AppTech/NCR Agreement, AppTech sustained and continues to sustain damages, including but not limited to the loss of its benefit of the bargain under the AppTech/NCR Agreement, including, but not limited to the residual compensation it is owed, lost profits and business opportunity, among other damages to be proven in this litigation.

///

///

///

# THIRD CAUSE OF ACTION

## (Breach of the Implied Covenant of Good Faith and Fair Dealing)

## (Against NCR and Does 1 through 10)

61. Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth in support of this cause of action.

62. Implied in every contract is a covenant of good faith and fair dealing that neither party will engage in any act or omission that is intended or has the natural tendency to deprive the other party of the full benefit of its bargain. This covenant is implied into the each of the Agreements, and imposes upon NCR, both directly and as a successor of JISO, a duty not to engage in acts or omissions that would frustrate AppTech's enjoyment of the rights and benefits owed or reasonably expected under the Agreements.

63. During the term of the AppTech/NCR Agreement, NCR asserted that its predecessor, JISO, in 2010 had unilaterally downwardly modified the amount of monthly residual compensation to be paid to AppTech for Referred Merchants solicited by AppTech and boarded with JISO, without proper notice of the change or obtaining AppTech's written consent, and thereafter engineered the residual reporting provided to AppTech in such a way that the change in the amount of monthly residual compensation would not be discovered by AppTech.

64. Based thereon, NCR asserted that it had been overpaying AppTech related to the ARW Agreement but refused to explain or provide documentation to substantiate why or how long it had been overpaying AppTech. In addition, NCR refused to apply a credit for residuals owed to AppTech as the result of a prior underpayment by NCR to AppTech prior to the alleged overpayment. When AppTech would not reimburse NCR for the claimed overpayment, NCR determined it to be an Event of Default and terminated the AppTech/NCR Agreement and with-it payment of AppTech's compensation thereunder, while retaining ARW as a customer.

65. NCR's actions, including manufacturing an unsubstantiated overpayment allegation to gain leverage in negotiations with AppTech regarding the amounts that

were actually underpaid to AppTech and refusing to engage in good faith efforts to resolve the dispute, breached the covenant of good faith and fair dealing.

66. As a direct and proximate result of NCR's breach of the AppTech/NCR Agreement, AppTech sustained and continues to sustain damages, including but not limited to the loss of its benefit of the bargain under the AppTech/NCR Agreement, including, but not limited to the residual compensation it is owed, lost profits and business opportunity, among other damages to be proven in this litigation.

## FOURTH CAUSE OF ACTION

### (Specific Performance)

### (Against NCR and Does 1 through 10)

67. Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth in support of this cause of action.

68. As alleged above, the AppTech/NCR Agreement is a valid agreement executed by the parties on or around April 24, 2020, which is attached as Exhibit 2.

69. NCR owes various obligations to AppTech under the AppTech/NCR Agreement, including, without limitation, the obligation to pay AppTech residual amounts derived from transactions processed for merchants boarded with NCR by AppTech, including, but not limited to, ARW.

70. As alleged above, NCR invalidly terminated the AppTech/NCR Agreement without justification under the terms of the AppTech/NCR Agreement, namely Sections 14 and 15 regarding Termination and Events of Default.

71. Despite NCR's unjustified termination of the AppTech/NCR Agreement, AppTech remains ready, willing and able to perform under the terms of the AppTech/NCR Agreement.

72. NCR has acted in bad faith by terminating the AppTech/NCR Agreement without adequate justification, ceasing its obligation to pay residual compensation to AppTech, converting merchant accounts boarded by AppTech for which AppTech has a right to receive residual compensation to NCR's own accounts, and by failing to

engage in efforts to resolve the parties' dispute in good faith.

73. Equitably, NCR should be ordered to perform its continuing obligations under the AppTech/NCR Agreement, including the fulfillment of its payment obligations to AppTech on a continuing basis going forward in addition to its obligation to pay AppTech amounts already due and owing under the AppTech/NCR Agreement.

74. AppTech therefore seeks an order requiring specific performance of NCR's obligations under the AppTech/NCR Agreement.

## FIFTH CAUSE OF ACTION

### (Accounting)

### (Against NCR and Does 1 through 10)

75. Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth in support of this cause of action.

76. AppTech is informed and believes, and based thereon alleges, that JISO, and NCR as its successor, unilaterally reduced the monthly residual compensation owed AppTech under the AppTech/JISO Agreement, without providing proper notice of the change and/or obtaining AppTech's written consent and formatted its monthly residual reports to AppTech documenting the payment of said residuals in such a way as to keep AppTech from discovering the reduction. Based thereon, NCR now contends that it overpaid AppTech, but refuses to explain or provide substantiating documentation reflecting why it believes it has overpaid, for how long, etc. Conversely, AppTech asserts it has been underpaid, but lacks access to the necessary financial reporting, held by NCR, that would allow AppTech to confirm this.

77. Notwithstanding numerous requests made by AppTech to NCR for residual reports documenting the calculation of residual payments made by NCR and JISO to AppTech, NCR refuses to provide that information/documentation.

78. The correct amount of residuals are rightfully due AppTech.

79. AppTech has requested an accounting from NCR, and NCR has failed to provide said accounting.

13

PLAINTIFF'S FIRST AMENDED COMPLAINT

80. The specific amount of money due by NCR to AppTech is unknown to AppTech and cannot be ascertained without an accounting. AppTech based on the foregoing is therefore entitled to a full accounting.

## **PRAYER FOR RELIEF**

WHEREFORE, seeks the following relief on its causes of action alleged above:

1. A judicial declaration establishing the parties' rights and duties pursuant to the AppTech/NCR Agreement, namely (1) what amounts are owed to AppTech by NCR, or vice versa based on NCR's contentions that it is owed money under the agreement, and (2) whether NCR's purported termination of the AppTech/NCR Agreement was valid.

2. For compensatory damages in excess of the jurisdictional minimum, and interest thereon, according to proof at trial;

3. For consequential damages, including, without limitation, lost profits and business opportunity and according to proof at time of trial;

4. For all costs and expenses, including attorneys' fees;

5. For prejudgment interest at the maximum legal rate; and

6. For such other and further relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims set forth in the Complaint.

Dated: December 1, 2022         GLOBAL LEGAL LAW FIRM

By: */s/ Christopher R. Dryden*
Christopher R. Dryden, Esq.
Michael D. Douglas, Esq.
Bryce M. Van De Moere, Esq.
Attorneys for Plaintiff
AppTech Payments Corp